BOB C. COOPER ET AL., APPELLEES, V. SANITARY DISTRICT NO. 1 OF LANCASTER COUNTY, NEBRASKA, APPELLANT.

'19 N. W. 2d 619

FILED AUGUST 8, 1945.   No. 31857.

*Max Kier*, for appellant.

*Peterson & DeVoe*, and *Davis, Stubbs & Healey*, for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

CARTER, J.

Plaintiffs commenced this action against Sanitary District No. 1 of Lancaster county, Nebraska, to recover damages to growing crops on certain lands belonging to the plaintiffs in Saunders county, Nebraska, on account of negligence in the construction and maintenance of drainage channels in Salt Creek valley extending generally from Lincoln to the point where it empties into the Platte river. The verdict of the jury was for plaintiffs in the amount of $3,-344.53. Judgment was entered on the verdict and the district has appealed.

Defendant is a sanitary district organized and existing under and by virtue of chapter 31, art. 5, R. S. 1943, and is wholly within Lancaster county. The district is vested with power to provide drainage for the lands in the district through the Salt Creek valley, Salt Creek being a natural stream which runs from Lincoln to a point below Ashland through parts of Lancaster, Cass and Saunders counties.

It is not disputed that the district is clothed with authority to establish, maintain and construct artificial channels and drains in the Salt Creek valley, within and below the district, for the purpose of draining the lands within the district.

The original channel in its meandering course from the city of Lincoln to the east line of section 10, township 12 north, range 9 east of the 6th P. M. in Saunders county, hereinafter referred to as the east line of section 10, was approximately 80 miles in length. The valley floor of Salt Creek is comparatively level. At Waverly, Nebraska, the width of the valley was about two miles from which point east it becomes narrower until at the east line of section 10 it has a width of one-quarter to one-half mile. The average fall per mile was 14 inches and the area drained west of the east line of section 10 was 1,135 square miles.

Between the years 1894 and 1938 the defendant, to alleviate flood conditions in the city of Lincoln, improved the drainage of Salt Creek valley by widening and deepening the channel and eliminating numerous curves and bends. The effect of these improvements was to reduce the length of the stream from the city of Lincoln to the east line of section 10 from 80 miles to 33 miles and to increase the fall from 14 inches to the mile to 36.5 inches to the mile. The water travel time between Lincoln and the mouth of the stream was thereby reduced from 31 to 7 hours. In 1941 and 1942 the defendant constructed a new channel from the east line of section 10 to connect with a previously constructed artificial channel, which new channel had a carrying capacity of much less quantity than the channel bringing the water to the east line of section 10.

On June 19, 1942, large quantities of water due to heavy rainfall along the upper and middle reaches of Salt Creek came down Salt Creek and its tributaries and flooded the lands of the plaintiffs lying adjacent to and northwest of section 10. It is the contention of the plaintiffs that their lands were flooded and their crops destroyed because of the negligence of the district in failing to construct a channel

east from the east line of section 10 of sufficient capacity to carry off all the water arriving at that point from the west and in negligently failing to construct said channel in a proper manner. In addition to a general denial, the district asserts that the lands of the plaintiffs were in the flood plain of Salt Creek in its natural state and from time immemorial were subject to overflow during rainy seasons. The district contends that the flooding in June, 1942, resulted from natural causes and was not attributable to an act of the district. Liability is denied on the further ground that the damage was the result of an act of God. The district further contends that by reason of an election held in Saunders county in June, 1928, pursuant to sections 31-507, 31-508 and 31-509, R. S. 1943, the plaintiffs are barred of any right to maintain this action for damages against it. The plaintiffs question the constitutionality of the foregoing sections of the statute and the bar which it purports to impose. It is upon these issues that the case must be decided.

The district contends that it can be sued in Lancaster county only and that the trial court was in error in holding that the action could properly be brought in Saunders county. It is a general rule that a municipal corporation can be sued only in the county where it is located. But there is a recognized exception to the rule in this state where the action is to recover damages for trespass upon or injury to real estate. In such cases an action is properly brought against a municipality in the county where the real estate or some part of it is situated. R. S. 1943, sec. 25-401; *State ex rel. Cary v. Cochran*, 138 Neb. 163, 292 N. W. 239; *State ex rel. Johnson v. Central Nebraska Public Power & Irrigation District*, 140 Neb. 471, 300 N. W. 379. The contention of the district on this point is without merit.

The contention of the district that plaintiffs are barred from maintaining this action by reason of an election held in Saunders county in June, 1928, pursuant to sections 31-507, 31-508 and 31-509, R. S. 1943, is also without merit. The provision relied upon by the district is clearly violative of the state Constitution. The particular provision of the

applicable statute is as follows: " * * * If a majority vote for the creation of a district, based on acreage represented, the sanitary district shall have jurisdiction to make the improvements recommended by the Department of Roads and Irrigation and to assess the special benefits thereof to the lands specially benefited. If a majority vote against the creation of a district, the work shall not be done, and in that event all owners of land included in the area defined by the Department of Roads and Irrigation shall be precluded from asserting any claim for damages against such sanitary district by reason of improvements previously made by it." R. S. 1943, sec. 31-509. All conditions precedent to the operation of this provision were admittedly present.

Section 21, art. I of the Constitution of Nebraska, is the following: "The property of no person shall be taken or damaged for public use without just compensation therefor."

Section 3, art. I of the Constitution of Nebraska, is the following: "No person shall be deprived of life, liberty, or property, without due process of law."

In *Bunting v. Oak Creek Drainage District,* 99 Neb. 843, 157 N. W. 1028, it was held that a drainage district, organized under the provisions of chapter 19, art. 5, R. S. 1913, which appears with amendments as chapter 31, art. 4, R. S. 1943, was liable for damages for negligence in the construction and maintenance of its works. The defendant here was organized under the provisions of a similar statute as was the Oak Creek Drainage District and the reasons set forth for affixing liability for negligence there are equally applicable here. Responding there to the theory that the district was engaged in the performance of a sovereign function it was said: "The state is a sovereign and cannot be sued without its consent. Being a sovereign, it is presumed that it will do justice to its citizens without compulsion, and even the sovereign itself under our constitution cannot take or damage private property without compensation."

Responding then to the proposition that the district was

not engaged in the performance of its functions as acts of sovereignty the following was quoted in the opinion with approval from *Bradbury v. Vandalia Levee and Drainage District,* 236 Ill. 36, 86 N. E. 163: " 'The ground of distinction between corporations which are liable for the negligent or wrongful act of their agents or servants and those which are not is that public involuntary quasi-corporations are mere political or civil divisions of the state created by general laws to aid in the general administration of the government and are not so liable, while those which are liable have privileges conferred upon them at their request, which are a consideration for the duties imposed upon them. * * * Neither the state, nor any part of it, is divided by the legislature into drainage districts, nor do they have public duties thrust upon them without their consent. The organization of a drainage district is for the sole and exclusive benefit of the territory within the district * * * , and the lands within the district are assessed to pay the whole cost on the theory that they alone are benefited. * * * The organization is not different, in principle, from the organization of cities, villages or towns under a general law, on a petition of a certain proportion of the legal voters within the territory. It is correct to say that a drainage district is a quasi-corporation if the act under which it is organized does not make it a corporation in fact; but it is not created for political purposes or for the administration of civil government.' "

In disposition of the question of liability of the district for damages for negligence it was said in the opinion: "The district chooses its own board of directors and its work is done under its direction and supervision. It is given certain additional powers and privileges because the formation of the district 'will be for the public health, convenience and welfare.' It is given the power of eminent domain as are railroads and ordinary municipal corporations. In the conduct of their affairs they must not negligently injure others. If they do, they are liable for such injuries as cities and villages are."

Clearly therefore the quoted portion of section 31-509,

R. S. 1943, seeks conditionally to destroy rights guaranteed under sections 3 and 21, art. I of the Constitution of the state of Nebraska.

The more difficult question to be determined is whether or not actionable negligence on the part of the district has been shown sufficiently to take that question to the jury.

The record shows that Salt Creek in its natural state was a watercourse rising west of Lincoln and pursuing a winding and twisting course down the valley through Ashland to a point where it flowed into the Platte river. The source of the stream arises from the confluence of six major natural tributaries converging in or near Lincoln. From its source to its mouth there are 15 main tributaries all but one of which enter the stream west of Ashland. The natural drainage area of Salt Creek and these 14 tributaries is approximately 1,143 square miles. The drainage area of the defendant district contains approximately 765 square miles.

Pursuant to plans adopted from time to time by the district through the years, the channel of Salt Creek. was straightened and widened from a point west of Lincoln to the east line of section 10, a point below plaintiffs' land. The carrying capacity of the stream in its natural state was about 2,600 second-feet. In making the improvements heretofore recited, the artificial channel was made progressively wider from Lincoln to the east line of section 10 with the result that its capacity was correspondingly increased. The capacity of the artificial channel immediately above the east line of section 10 is approximately 10,000 to 12,000 second-feet. The artificial channel constructed east from the east line of section 10 carried approximately 8,000 second-feet of water while the old channel at flood time was utilized to the extent of 2,000 to 3,000 second-feet to get water away at this point. There is no dispute in the evidence that the combined carrying capacity of the old channel and the artificial channel east of the east line of section 10 was much greater than the capacity of the channel as it existed prior to 1942.

One of the contentions advanced by the district is that it

had the same right as an upper riparian owner to make the improvement, the effect of which was to increase and accelerate the flow of water to the east line of section 10. It is urged that the rule in this state permits a riparian owner, in the interest of good husbandry, to increase and accelerate the flow in the natural course of drainage without liability for injuries caused a lower proprietor. This rule, with certain substantial limitations, applies to surface waters only, in this state. *Hengelfelt v. Ehrmann,* 141 Neb. 322, 3 N. W. 2d 576; *Steiner v. Steiner,* 97 Neb. 449, 150 N. W. 205, and cases therein cited. However, there is a clear distinction in the rules of law governing surface waters and floodwaters flowing as a part of a natural stream during flood season. We are committed to the rule that overflow waters flowing in the natural flood channel of a running stream are a part of the stream and are governed by the running water rule. *Hofeldt v. Elkhorn Valley Drainage District,* 115 Neb. 539, 213 N. W. 832; *Buchanan v. Seim,* 104 Neb. 444, 177 N. W. 751; *Murphy v. Chicago, B. & Q. R. Co.,* 101 Neb. 73, 161 N. W. 1048; *Brinegar v. Copass,* 77 Neb. 241, 109 N. W. 173. We think the rule with reference to floodwaters applies in the present case and that it is not therefore necessary to discuss the rule applicable to surface waters.

A watercourse is generally defined as a stream of water with a well-defined existence which makes it valuable to the riparian owners along its course. See, also, section 31-202, R. S. 1943. To such streams riparian rights attach. Where water appears upon the surface of the ground in a diffused state with no permanent source of supply or regular course, its flow is valuable to no one and it is regarded as surface water. But where such waters flow into and become a part of a stream, they cease to be surface waters and are then a part of the running water of the stream. Likewise, the running waters of a stream may at flood stage spill out upon low lands, become isolated and again be classified as surface waters. In the instant case the waters causing the damage to plaintiffs' lands were floodwaters as distinguished from

surface waters. Necessarily, floodwaters which have lost their identity with those of a living stream and returned to the classification of surface waters would be governed by the rules applicable to surface waters. But when the waters causing damage retain their identity with those of a stream, they cannot be properly treated as surface waters and must necessarily be treated as floodwaters when without the banks of the stream. This compels the holding that a stream which is accustomed to extend itself beyond its banks in times of high water and to flow over the adjacent lands in its flood plane in a broader stream, retains its character as a live stream and the law relating to floodwaters applies.

The situation is well expressed by an authoritative text writer as follows: "Every stream flowing through a country subject to a changeable climate must have periods of high and low water. And it must have, not only its ordinary channel which carries the water in ordinary times, but it must have, also, its flood channel to accommodate the water when additional quantities find their way into the stream. The flood channel of the stream is as much a natural part of it as is the ordinary channel. It is provided by nature, and it is necessary to the safe discharge of the volume of water. With this flood channel no one is permitted to interfere to the injury of other riparian owners. When the water rises until it reaches the margin of this flood channel, and begins to flow over it, it may do so in natural vents or outlets which are a part of the stream, and with which there can be no individual interference to the injury of other persons; or it may spread out uniformly over a large section of country in small volume and with no definite course or ultimate destination, but which will gradually be lost by evaporation or percolation into the ground. The principles which prevent interference with the water when a part of the rushing torrent, or when finding its way by well-defined outlets from one stream to another, do not apply with equal force to the water when it is spread out over the face of the country in such a way as to have lost its power to maintain a continued flow. By keeping these forms distinct, and considering in

every case to which of them a particular decision applies, most of the seeming conflict in the authorities disappears. Thus, the courts are very nearly agreed that the flood channel must be considered as a part of the channel of the stream, and that no structures or obstructions of any kind can be placed in its bed which will have a tendency to dam the water back upon the property of the upper riparian owner." 3 Farnham, Waters and Water Rights, sec. 880, p. 2562. That a riparian owner may not dam, retard or bank against the floodwaters of a running stream to the injury of lower proprietors is a settled question in this state. *Murphy v. Chicago, B. & Q. R. Co., supra; Hofeldt v. Elkhorn Valley Drainage District, supra.*

Whether or not the district has been negligent in the construction of its works which has resulted in a damming or an undue interference with the waters of Salt Creek to the damage of these plaintiffs constitutes a question of fact ordinarily to be determined by a jury. If the evidence, if believed, is sufficient to sustain a judgment, the verdict of the jury must stand.

In determining whether negligence on the part of the district has been shown, a brief review of the historical facts pertaining to Salt Creek and environs is pertinent. It is established by the evidence that the Salt Creek valley has always been subject to flood conditions. Practically every year the creek left its banks and inundated the low lands on the flood plane of the stream. It is evident that in its state of nature floods came regularly and overflowed the adjoining low lands. Ofttimes the water covered only the low sections of the bottom lands for short periods of time, such floods, if they may be called such, often proving beneficial to crops growing on such lands. At other times the floods were higher and covered more land for longer periods of time with the result that they damaged or destroyed crops growing on the agricultural lands in the valley. The largest flood appears to have occurred in 1908 when the whole valley was inundated. The flood of June, 1942, appears to have reached a high-water mark exceeded only by the flood of

1908. The flooding of the low bottom lands appears to have been of frequent occurrence while the larger floods appear to have occurred with regularity, although with less frequency. It is estimated by an hydraulic expert that floods similar to that of 1908 would occur at an average interval of one in each 50 years. The flood area was not limited to the lower reaches of the stream. The city of Lincoln, near the point where the headwater tributaries of the stream came together was subject to flood. To protect the city and the industrial development taking place in the part of the city close to the stream, the defendant district was organized. The purpose of the district was to provide drainage and flood protection for the lands within the district. It was no part of the duties of the district to drain or otherwise improve the lands below the district or to afford drainage or flood protection for such lands. It was the duty of the district, however, to use reasonable care in its construction of artificial channels, drains, grades, bridges and other work incidental to the accomplishment of its purposes. The question to be here determined is whether the district was free from negligence in its operations in so far as the lands of these plaintiffs are concerned.

The evidence shows that plaintiffs' lands contained a small area that was subject to flood whenever the stream reached a flood stage of ten feet above the normal elevation of Salt Creek. A much greater portion of the land required a flood stage of 14 feet to cause inundation. The record shows that the flood stage of the stream at the east line of section 10 was 16 feet above the normal height of the water in the stream. It is clear therefore that plaintiffs' lands were flooded to the extent alleged in their petition.

It is the contention of plaintiffs that the construction of the artificial channel from the city of Lincoln to the east line of section 10 resulted in a stoppage or retarding of the water at that point, a piling up of the water so to speak. It is urged that such damming or retarding of the floodwaters at that point caused the water to flow back and inundate plaintiffs' lands. We do not think the evidence is sufficient

to sustain a verdict based on any such theory as we will hereinafter demonstrate.

The record shows the normal water level elevation of the stream as 1,054 feet above sea level at the Schuyler railroad bridge located approximately one mile east of the east line of section 10. At the east line of section 10, the elevation was 1,057 feet. At the west line of section 10 it was 1,060 and approximately a mile and a half upstream at the point where it crosses the north line of sections 16 and 17, it was 1,064. The measurements of the high-water marks of the June, 1942, flood above the normal surface of the stream show stages of 17, 16, 15 and 17 feet, respectively, at the foregoing points. The peak water level of the flood was therefore 1,071, 1,073, 1,075 and 1,081 respectively, at the points heretofore mentioned. The variance in the different heights of the flood at these various points is explained by losses caused by breaks and washouts and by waters coming into the stream as a result of local rainfall and the return of spilled waters. These variances do not appear material in determining the question presented. Even with the variance in the maximum flood elevations, the high-water marks indicate a slope from west to east through the whole section of the watercourse we have here described. There is a two-foot fall from the west line of section 10 to the east line of that section and a further fall of two feet from the latter point to the Schuyler bridge. This indicates that there was no retarding or damming of the channel at the east line of section 10 as alleged. It is also apparent that no additional depth of the water at the east line of section 10 was created as a result of damming or retarding of the stream, a fact that is essential of proof in establishing a damming or retarding of the waters of the stream. It is true that the flood stage at the east line of section 10 was shown to be one foot higher than one mile upstream, but this is explained in the evidence as resulting from the return of spilled waters and runoff waters resulting from heavy local rains.

There is evidence in the record that the floodwaters ap-

peared to back up from the east line of section 10 and overflow plaintiffs' lands. It is elementary, of course, that water seeks its own level and as the waters of Salt Creek arose, they would flow into and over areas of lower elevation. It is not questioned that some floodwaters flowed in a northwesterly direction onto plaintiffs' lands. But it is just as positively established that the crest of the flood on plaintiffs' lands did not originate at the east line of section 10 for the simple reason that its highest stage at that point was lower than the highest stage on plaintiffs' lands. Many elevations on the lands of the plaintiffs which were flooded exceeded 1,073 feet, the highest stage of the flood on the east line of section 10. While it is true that waters at the east line of section 10 would spread out in any direction to that elevation, it could not cause a backwater on lands exceeding 1,073 feet in elevation. It is definitely shown that the crest of the flood on plaintiffs' lands exceeded considerably the elevation of 1,073 feet. Consequently, the waters causing the crest of the flood must have come from some other source, probably from the west and south, where higher peak flood elevations are shown. In any event, we think the evidence conclusively shows the absence of a dam or a piling of waters at the east line of section 10. The slope of the peak flood elevations east of the east line of section 10, the want of additional water depth at the point of the claimed damming or retarding of the waters, the failure to establish that a headwater was created at that point of sufficient height to provide a backwater capable of flooding plaintiffs' lands at the elevation it was flooded and the fact that it was the second largest flood in the history of the stream all furnish convincing proof that the construction of the artificial channel to the east line of section 10 was not the proximate cause of the flooding of plaintiffs' lands, either to the extent or for the length of time that they were inundated.

The evidence further shows that at the time of the June, 1942, flood, there was no flood in Lincoln or the defendant district. A short distance above the point where Rock Creek flows into Salt Creek, the same being about 11½

miles upstream from the Schuyler bridge, the stream was flowing 8,600 second-feet of water within the channel banks on June 20, 1942, while 14,000 second-feet was passing the Schuyler bridge on the same day. It is evident therefore that 5,000 or 6,000 second-feet of local water was augmenting the flow of the stream below Rock Creek and making a major contribution to existing flood conditions. This water, with the stream in a state of nature, would have flooded plaintiffs' lands, the capacity of the channel during that period being only 2,600 second-feet. It is also noteworthy that the peak elevations of the 1908 flood which occurred at a time when little work had been done by the defendant district, paralleled the peak elevations of the June, 1942, flood. This indicates that there was no more retarding or damming of the stream in 1942 than in 1908. There is also evidence in the record that plaintiffs' lands would have been flooded for a longer time and to a greater depth if the works of the defendant district had never been constructed. We think the facts upon which this statement is based substantiate this conclusion.

In *Murphy v. Chicago, B. & Q. R. Co., supra,* we said: "Plaintiff contends that the bridges by the obstruction they created on account of piling in the channel and insufficient openings caused the flood within this channel and over the other lands. We are convinced, however, from an examination of all the evidence that the waters were so high that, even if the bridge and railroad had not existed, they would still have followed the course through the streets of Homer and down the depression west of the stream, and we find the evidence insufficient to sustain the fifth cause of action."

The court summarizes in the syllabus the proper measure of damages in the following language: "If, however, some damage would have occurred, even if the railroad embankment had not been built, the company would only be liable for such damages in addition thereto as were caused by the damming or obstruction of the waters to a greater height or for a longer time than would otherwise have occurred."

Assuming, however, that plaintiffs' land would have

flooded with the Salt Creek watercourse in a state of nature, and that the negligence of the district made some contribution thereto, the burden is upon the plaintiffs to show the extent of the increased overflow and the amount of damages arising therefrom. There is no attempt made in the present record to make such an allocation of damages. This fact, coupled with our finding that plaintiffs' land would have been flooded whether the works of the defendant were built or not, is sufficient to defeat the judgment. *Compton v. Elkhorn Valley Drainage District*, 124 Neb. 299, 246 N. W. 340.

Plaintiffs' engineering expert testified that good engineering practices required the construction of an artificial channel with a capacity of 44,300 second-feet from the east line of section 10 to the Platte river. Such a construction would necessarily contemplate the removal of all flood and drainage waters above that point. The defendant district is not required to protect all the lands in the Salt Creek watershed above that point from flood and surface waters. Its duty, generally speaking, is to carry out its purposes without creating conditions more hazardous to lower landowners than existed before their operations were commenced. This rule does not require that the district should build an artificial channel with a capacity of 44,300 second-feet to escape a charge of negligence. Neither does a reasonable use of the stream and the use of good engineering practices require the construction of a channel of such magnitude by the district.

Floods such as the one presently before us are to be expected at occasional intervals throughout the years. Less often, floods of greater magnitude may occur. We cannot say under these circumstances that they constitute an act of God as that expression is known to the law. We think the evidence fails to show that the damage to plaintiffs' crops was caused by any negligence of the district or that the engineering practices employed constituted a negligent use of the watercourse under the evidence appearing in the record before us. The trial court erred in refusing to give

the district's tendered instruction number 1, directing the jury to return a verdict for the defendant. The judgment is reversed and the cause dismissed.

REVERSED AND DISMISSED.

YEAGER, J., concurs in the result.