WALTER L. COURTER, APPELLEE, v. FRED MALOLEY, APPELLANT.

41 N. W. 2d 732

Filed March 10, 1950. No. 32675.

*William A.. Stewart,* and *Beatty, Clarke, Murphy & Morgan,* for appellant.

*Elbert H. Smith* and *Bernard B. Smith,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

YEAGER, J.

This is an action by Walter L. Courter, plaintiff and appellee, against Fred Maloley, defendant and appellant, to enjoin the defendant from maintaining a dike along the north line of a quarter section of land owned by him in Dawson County, Nebraska, which land is immediately to the south of the land owned by plaintiff, and for damage to crops which the plaintiff contends was caused by the construction and maintenance of the dike. The lands of plaintiff and defendant are divided by a section line on which has been constructed a public highway.

A trial was had to the court and a decree was entered enjoining the maintenance of the dike and awarding plaintiff damages in the amount of $467.50. From this decree and an order overruling a motion for new trial the defendant has appealed.

In order that the confronting situation may be comprehended it becomes necessary to describe in some detail the terrain involved as well as a considerable amount of that which surrounds it.

The highway which has been mentioned as occupying the section line between the land of plaintiff and defendant extends east and west. In the record it is known as the Old Lincoln Highway. To the north of and bordering the highway are Sections 1, 2, and 3. Section 1 is the most easterly, Section 2 adjoins it, and Section 3 adjoins Section 2. Immediately to the south of Section 1 is Section 12 and to the south of Section 2 is Section 11. No other land to the south requires specific designation.

The plaintiff owns the land in the southeast quarter of Section 1. The defendant owns the land in the northeast quarter of Section 12. The defendant also owns substantially the south one-half of the northwest quarter of Section 12.

In about 1921 the highway was graded and graveled and became part of the then Lincoln Highway or U. S. Highway No. 30. Prior to that time it was a dirt road and in elevation in all probability conformed generally to the immediate area through which it passed. Over the distance with which we are particularly concerned, which is from the west line of Section 2 to the east line of Section 1, the grade appears to have been from 18 inches to 2 feet above the borders immediately to the north and to the south. In the construction of the grade borrow ditches were made on both sides of the highway. These ditches were opened all of the way to the east of the lands of plaintiff and defendant.

All of the lands in the area named and the adjacent area slope or have a fall generally and, we think it may well be said, gently to the southeast and from the northwest.

Extending from the northwest is a watercourse known in the records as watercourse No. 1, which enters from the west side of plaintiff's land, crosses in a meandering course in a general easterly direction nearly to the east side thereof, thence southeast where it passes out of plaintiff's land, across the highway and onto defendant's

land, and thence on southeast. The borrow ditches along the highway open into this watercourse No. 1.

A watercourse designated as No. 2 also originates to the northwest. It extends from the northwest to the southeast generally diagonally across Section 3. It leaves Section 3 and enters Section 2 at a point a short distance north of the southeast corner of Section 3 and the southwest corner of Section 2. Originally it extended in a southeasterly direction and crossed the highway into the northwest quarter of Section 11 a short distance east of the west line of Sections 2 and 11. Later the course on the southwest quarter of Section 2 was artificially changed so that it followed the section line between Sections 2 and 3 down to the borrow ditch on the north side of the highway.

Prior to the establishment of the grade of the highway in 1921 there was a wooden bridge over this watercourse where it crossed the highway. The purpose was to take care of the passage of the water coming down the watercourse. An effort was made to cast doubt as to the existence of this bridge but we conclude from the record that its existence at that time has been sufficiently shown.

When the grade was established in 1921 this bridge was either torn out and the passage filled or the fill was made without removal of the bridge. In any event never after the grading of the highway was there a passage across the highway at or in the vicinity of the bridge.

Thereafter at times which are not made certain two 18-inch culverts were placed under the highway extending from the borrow ditch on the north to the borrow ditch on the south side of the highway. The exact locations do not appear from the record but one appears to be about a half mile east of the point where the old bridge had been and the other about three-quarters of a mile in the same direction. Both culverts were more than a half mile west of the Courter land and of the land of Maloley bordering on the highway. After the con-

struction of these culverts at least the north borrow ditch was dammed to the east. This condition however lasted not more than about two years. Whether the dams were torn out or washed out appears none too clearly in the record.

To the south of the highway and extending the length of the land of the defendant was an irrigation lateral. This was elevated above the level of the ground along it. Just what the elevation was is not certain but it appears that the level was near that of the highway after grading. It of course was in the nature of a dike against water coming from the north. Whether it was on the land of defendant or on the highway right-of-way is left in doubt by the record. The then county surveyor said that it was on the right-of-way and was removed when the grade was repaired and elevated in 1943. In any event the lateral was there for a long period of time and until 1943.

From the time the two 18-inch culverts were constructed nothing further was done with regard to drainage or reconstruction of the highway until 1943. At this time the grade was elevated. The elevation of the grade was brought, as near as may be ascertained from the record, to about the grade elevation of 1921. It may have been somewhat higher. The dirt used was taken from the borrow ditches along the highway which of course made these ditches larger.

The condition thus created existed until 1946 when a county commissioner of Dawson County, Nebraska, at the request of and in agreement with the plaintiff, caused a 36-inch culvert to be constructed from the borrow ditch on the north to the borrow ditch on the south side of the highway at a point about one-eighth of a mile east, of the west line of the southeast quarter of Section 1 and the northeast quarter of Section 12.

In 1947 the defendant constructed or reconstructed a dike along the north side of his land. This was at least as high as the grade of the highway and we think from

the record that it is reasonable to say that it was higher. The defendant indicated that an irrigation channel was to traverse the dike but we think whether or not this was a purpose is not a matter of consequence insofar as the issues of this case are concerned.

The effect of the grading of the highway and the destruction of the wooden bridge across it was to block and cut off the waters coming down watercourse No. 2 and to divert them to the east along the north side of the highway with the borrow ditch on that side as the channel of flow with watercourse No. 1 as the only outlet. After the 18-inch culverts were constructed there was also a channel of flow through the borrow ditch on the south side to watercourse No. 1.

In periods of ordinary rainfall it appears that this was sufficient to take care of the run-off of the waters which accumulated in this vicinity, but in periods of heavy rainfall this was not true.

After the highway was graded and at all times thereafter water from a large area was caused to collect in the vicinity of the old crossing of the highway by watercourse No. 2 and to the east thereof and to flow from that location east along the highway.

It is thought that the record discloses that all of the water from the natural drainage area of watercourse No. 2 came down here, and also an undetermined and probably an undeterminable portion from two other watercourses lying to the south and west of watercourse No. 2 and parts of which lie north of the line on which the highway was constructed. These two watercourses are Strever Creek and Spring Creek. Just how the waters of these two creeks are caused to flow in this wise is not made definite but from a reading of the evidence and an examination of the exhibits it appears probable that the direction of their natural flow was cut off by the grade of the highway and the flow was diverted east toward watercourse No. 2 along the north side of the highway. It appears further that watercourse No. 1

where it crosses the section line between Sections 1 and 2 was cut and obstructed thus preventing free flow of waters down the watercourse from the northwest beyond this line, and because thereof and because of the further fact that drainageways were constructed along this line southward much of the water which would have flowed on through, had not the watercourse been thus interfered with, was caused to flow down to the north side of this highway.

In periods of heavy rainfall and before the construction of the 36-inch culvert in 1946 when the outlets were insufficient to take care of this concentration of water, the water would build up and back up onto the farm of plaintiff until it reached the height of the highway grade when it would flow or spill over and in accordance with the evidence of the plaintiff flow off to the south or southeast across the lands of the defendant.

We think the evidence in this connection does not support a conclusion that it flowed in what might be regarded as a channel but only in diffusion.

In 1947 in this vicinity and over a large surrounding area there came a period of extremely heavy rainfall. It has been described as unprecedented for the area. The waters piled up and backed up on plaintiff's farm, got into his buildings, destroyed crops, and did other damage on the farm. Waters rushing through the 36-inch culvert cut through the dike which had been constructed by defendant and cut a channel a short distance to the south in his field. Much of the dike for a considerable distance was washed out by the waters.

The dike at least at the point where it was cut by the waters coming through the culvert has been restored. At this point the dike was restored apparently in such manner and with such material as to be impervious to a rush of water coming through the culvert.

It is the maintenance of the dike by defendant along the north side of his land that the decree of the district court enjoined, and it was for damage caused by the flood

of 1947, which damage plaintiff attributes to the maintenance of the dike by the defendant, that the court rendered judgment.

The theory of the petition is that plaintiff has the right to have the waters flowing along the highway, over it, and through the 36-inch culvert flow southward across defendant's land. It is the further theory of his petition that the flow across defendant's land in this vicinity is through a natural flood channel and that the stoppage of such flow by the dike of defendant is the obstruction of the flow of water in a natural flood channel.

Watercourse No. 2 as it comes down past where the wooden bridge was located extends in a southeasterly direction and enters defendant's land well below or south of the highway and traverses the land generally in an east, southeasterly direction and from the east line thereof it extends onward to the southeast.

It should be pointed out here that in this action plaintiff does not claim a right to have the water follow the natural watercourse across the highway but to have it cross approximately one and one-half miles to the east of that point.

It is to be pointed out here also that from the evidence and within the meaning of legal definitions which will appear later herein there was no watercourse crossing the highway between the place where the wooden bridge had been and watercourse No. 1. There was nothing more than slight variations in the topography over the entire width.

The general theory of the defendant is that his dike had been constructed more than 20 years before the commencement of the action and that because thereof he had a right to maintain it, and that the collection of waters along the highway was an unnatural collection of waters against which he had the right to protect his land by the dikes which he constructed and maintained.

By reply the plaintiff claimed a prescriptive right to have the waters accumulating as indicated flow across

the lands of defendant without interference by the dike.

In order to determine the questions involved herein it becomes necessary to bear in mind certain definitions, characterizations, and legal principles among which are the following:

By statute a watercourse is defined as follows: "Any depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook shall be deemed a watercourse." § 31-202, R. S. 1943.

In Pyle v. Richards, 17 Neb. 180, 22 N. W. 370, a watercourse was characterized as follows: "To constitute a watercourse the size of the stream is not material. It must, however, be a stream in fact, as distinguished from mere surface drainage occasioned by freshets or other extraordinary causes, but the flow of water need not be continuous." This characterization was approved in Snyder v. Platte Valley Public Power and Irrigation District, 144 Neb. 308, 13 N. W. 2d 160, 160 A. L. R. 1154; Jack v. Teegarden, 151 Neb. 309, 37 N. W. 2d 387; Pint v. Hahn, ante p. 127, 40 N. W. 2d 328; and applied in the determination of the rights of litigants from the date of pronouncement to the present time. Cases in which it has been applied are Leaders v. Sarpy County, 134 Neb. 817, 279 N. W. 809; Born v. Keil, 146 Neb. 912, 22 N. W. 2d 175; Olson v. Roscoe, 149 Neb. 189, 30 N. W. 2d 664; Pint v. Hahn, supra.

In Morrissey v. Chicago, B. & Q. R. R. Co., 38 Neb. 406, 56 N. W. 946, surface water was characterized as follows: "The term 'surface water' includes such as is carried off by surface drainage,—that is, drainage independently of a water-course, * * *."

The water being characterized was overflow from a stream known as Yankee Creek which overflow never returned to Yankee Creek. It found its way eventually into the Nemaha River but not through a watercourse outlet. On this basis the court concluded that the overflowed water was surface water.

This characterization was approved in Snyder v. Platte Valley Public Power and Irrigation District, *supra*.

In Cooper v. Sanitary District No. 1, 146 Neb. 412, 19 N. W. 2d 619, surface waters and floodwaters were defined and distinguished as follows: "Where water appears upon the surface of the ground in a diffused state with no permanent source of supply or regular course, its flow is valuable to no one and it is regarded as surface water. But where such waters flow into and become a part of a stream, they cease to be surface waters and are then a part of the running water of the stream. Likewise, the running waters of a stream may at flood stage spill out upon low lands, become isolated and again be classified as surface waters. * * * Necessarily, floodwaters which have lost their identity with those of a living stream and returned to the classification of surface waters would be governed by the rules applicable to surface waters."

The flood plane of a live stream is the adjacent lands overflowed in times of high water from which floodwaters return to the channel of the stream at lower points. This plane is regarded as a part of the channel and the water flowing within the channel or its flood plane is characterized as floodwater. Frese v. Michalec, 148 Neb. 567, 28 N. W. 2d 197; Hofeldt v. Elkhorn Valley Drainage District, 115 Neb. 539, 213 N. W. 832, 53 A. L. R. 1174; Cooper v. Sanitary District No. 1, *supra;* Stocker v. Wells, 150 Neb. 51, 33 N. W. 2d 445.

In this jurisdiction it is a general rule that surface waters may be controlled by the owner of the land on which they fall, or originate, or over which they flow and he may refuse to receive any that falls, or originates, or flows on or over adjoining land. His right in this respect however must be so exercised as not to unnecessarily or negligently cause injury to the rights and property of others. Jorgenson v. Stephens, 143 Neb. 528, 10 N. W. 2d 337; Snyder v. Platte Valley Public Power and Irrigation District, *supra*.

With regard to floodwaters, the owner or proprietor of lands bordering upon either the normal or flood channel of a natural watercourse is entitled to have its water, whether within its banks or in its flood plane, run as it was wont to run according to natural drainage, and no one has the lawful right by diversion or obstruction to interfere with its accustomed flow to the damage of another. Olson v. Roscoe, *supra;* Kane v. Bowden, 85 Neb. 347, 123 N. W. 94; Keifer v. Stanley, 111 Neb. 822, 198 N. W. 144; Leaders v. Sarpy County, *supra;* Born v. Keil, *supra.*

In this jurisdiction water flowing in a well-defined watercourse may not, except in the exercise of the power of eminent domain, lawfully be diverted and cast upon the lands of an adjoining proprietor where it was not wont to run according to natural drainage nor may surface waters, except likewise under the power of eminent domain, be lawfully concentrated and discharged through an artificial channel in unusual quantities upon lands of an adjacent owner to his damage. Kane v. Bowden, *supra;* Leaders v. Sarpy County, *supra;* Snyder v. Platte Valley Public Power and Irrigation District, *supra;* Born v. Keil, *supra;* Olson v. Roscoe, *supra;* Andersen v. Town of Maple, 151 Neb. 103, 36 N. W. 2d 620.

The law does not require an owner of land to bear the burden of water diverted from the natural flow of one stream and discharged into another stream thereby causing the latter to overflow its banks and flood his lands. Costello v. Colfax County, 112 Neb. 40, 198 N. W. 357.

The rights and liabilities of the parties hereto are ascertainable by an application of the definitions, characterizations, and legal principles set out to the pertinent evidence as it has already been summarized and the reasonable inferences to be drawn therefrom.

There can be little question that the effect of grading the highway in 1921 was to divert the entire flow of

watercourse No. 2 from its natural course of drainage. At least a part of the flow of two other watercourses was likewise diverted. Probably since 1921 there has been a diversion from a part of watercourse No. 1 and a concentration of surface waters from the watershed of watercourse No. 1. All of this has been concentrated north of the highway and caused to flow east past defendant's and plaintiff's land except on those occasions when the provided outlets were insufficient to take care of the flow. When this occurred the excess backed up onto plaintiff's land until the crest rose above defendant's dike when it spilled over onto defendant's land which was lower than the land to the north and lower than the highway.

Under the rules set forth the defendant was not required to bear the burden either of the water diverted from the natural watercourses or of the concentrated surface water unless there was a right of diversion and concentration flowing from proceedings in eminent domain. The record fails to disclose any such right and it is reasonably inferable that no such right exists.

If he was not required to bear this burden then it is but reasonable to say that no one had the right to have this water spill over onto his land. What affirmative or positive right did he have with regard to protection of his land against the burden?

There is no doubt under the decisions cited that as a remedy he had recourse to a court of equity for protection against this diversion and to a court of law for damages if any ensued on account thereof. Were, however, those his only remedies? We think not.

The decisions appear to entitle defendant to relieve himself from the burden of these waters in the exact manner that he may relieve himself of the burden of surface waters.

As to surface waters he may set up works so as to prevent their entry upon his land provided that he is free from negligence in the construction of the works

even though damage to an adjoining landowner may be an incident thereof. We think and so decide, that the rule in those situations is applicable here.

It appears reasonable to say that such a right was and is a continuing right and that the right is commensurate with the necessity for protection.

It is preponderantly shown that the right was exercised over the years by maintenance of an elevated irrigation lateral. It is likewise shown that in 1947 a new dike was constructed to serve the purpose of the old elevated lateral which had probably been destroyed as a consequence of grading in 1943. The elevation of this dike was probably above that of the old lateral.

The old lateral probably did and the new dike probably will cause incidental damage to the land of plaintiff but it may not well be said that there was negligence in the construction of either. Neither obstructed the flow of water in either artificial or natural watercourse nor diverted the flow in the channel or channels from the beginning to the outlet. In truth the effect of the works as constructed was to keep this water in the channel which was provided for it.

The plaintiff insists that he has the right to have this water pass down over the land of defendant on the theory that it must be regarded as water flowing in the flood plane of watercourse No. 2. This, from the decisions cited, obviously is not correct. The water of this watercourse was diverted therefrom, never to return, at the point on the highway where the old bridge had been removed. If this water was in a flood plane it was that of the two borrow ditches along the highway. Water spilling over these to the south left this plane forever and under the decisions became surface water and so remained unless and until by surface drainage it joined watercourse No. 2 to the southeast.

The plaintiff urges that he has an easement by prescription for the flow of water from his lands to those of the defendant.

That an easement may be acquired by prescription for the flow of waters there can be no doubt. Such an easement however cannot be acquired except by open, notorious, exclusive, and adverse use for a period of ten years. Dawson County Irrigation Co. v. Stuart, 142 Neb. 428, 6 N. W. 2d 602. While this case was ultimately disposed of by an opinion other than the one in which this pronouncement was made, the pronouncement was not departed from. This rule has application to watercourses and their flood planes but it has never been applied to surface waters. Buchanan v. Seim, 104 Neb. 444, 177 N. W. 751; Onstott v. Airdale Ranch and Cattle Co., 129 Neb. 54, 260 N. W. 556; Dawson County Irrigation Co. v. Stuart, *supra;* Born v. Keil, *supra.*

As to the culvert there was no user for ten years. It was not constructed until 1946. The plaintiff attempted to show that the overflow passed down through a well-defined channel. The evidence does not sustain his contention. Its passage after spilling over is quite clearly shown to be as surface water within the meaning of the decisions. No easement by prescription existed for the flow of this water.

The record conclusively shows that plaintiff has been damaged as the result of the diversion of the water from watercourse No. 2 and the others mentioned and the concentration along this highway but we fail to see how it can be said that he has a remedy against the defendant.

This is not to say that after the diversion he was left without remedy. The remedies in equity and at law which we have pointed out as available to the defendant were likewise under the authorities cited available to the plaintiff.

In the view taken the record fails to sustain a cause of action against the defendant and the decree should be and is reversed and the action dismissed.

REVERSED AND DISMISSED.