GEORGE P. MADER ET AL., APPELLEES, V. HENRY W.
METTENBRINK ET AL., APPELLANTS.

65 N. W. 2d 334

Filed July 23, 1954.   No. 33513.

*Harold A. Prince,* for appellants.

*Cunningham & Cunningham,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

George P. Mader and Geraldine P. Mader brought this action in the district court for Hall County against Henry W. Mettenbrink and Beulah Mettenbrink. The purpose of the action is to obtain a mandatory injunction compelling the defendants to make an opening in, or place a culvert through, their irrigation dike; to restore an alleged watercourse across their land to its former condition; and for such other and different relief as the court may deem equitable. Trial was had and the court found generally for the plaintiffs. It decreed:

"* * * that the defendants Henry W. Mettenbrink and Beulah Mettenbrink, the owners of the Southwest Quarter of Section Twenty-nine, Township Twelve, Range Nine in Hall County, Nebraska, forthwith remove that part of their irrigation dike, immediately North and opposite the culvert, which is located between the Southwest Quarter of Section Twenty-nine, and the Northwest Quarter of Section Thirty-two above described so that the water which flows through said culvert may continue in its natural course into Silver Creek or in lieu thereof that the said defendants forthwith make an opening through or place a culvert under said irrigation dike so that the water flowing through the culvert between Section Twenty-nine and Section Thirty-two, above described, may continue to flow in its regular course into Silver Creek.

"* * * that the defendants should forthwith remove from said water course, on their land, any dirt which the defendants have placed in said water course, which dirt will prevent the water flowing from the above described culvert in its regular course through the defendant's land into Silver Creek and that the defendants and each of them their agents and employees be permanently enjoined from erecting any dike or other obstruction on their land immediately North and opposite said culvert between Sections Twenty-nine and Thirty-two, which will prevent the natural flow of the water through said culvert, across the defendants land and into Silver Creek."

Defendants filed a motion for new trial and, from the overruling thereof, have perfected this appeal.

In considering the appeal the following is applicable to our consideration of the record: "It is the duty of this court in an equity case to try the issues de novo and to reach an independent decision without being influenced by the findings of the trial court except if the evidence is in irreconcilable conflict this court may consider that the trial court saw the witnesses, observed their manner

of testifying, and accepted one version of the facts rather than the opposite." Keim v. Downing, 157 Neb. 481, 59 N. W. 2d 602.

Appellees, since February 1943, have been the joint owners of the northwest quarter of Section 32, Township 12 North, Range 9 West of the 6th P. M., in Hall County, except two acres in the northwest corner thereof used for school purposes. They purchased this land from the McDonalds who were, prior thereto, and as far back as here material, the owners thereof. We shall herein refer to this quarter section as either the McDonald or Mader land, depending upon who was owner at the time. Appellants are the joint owners of the southwest quarter of Section 29, Township 12 North, Range 9 West of the 6th P. M., in Hall County. They acquired this land from appellant Henry W. Mettenbrink's father, Charles Mettenbrink, Sr., who was prior thereto, and as far back as here material, the owner thereof. The northeast quarter of Section 36, Township 12 North, Range 10 West of the 6th P. M., in Hall County, lies just west of the Mader land. It was formerly owned by George A. Mader, father of appellee George P. Mader, and is the place on which the appellees reside. There is a stream called Silver Creek flowing east and northeast across the northeast quarter of Section 36 and the southwest quarter of Section 29.

The evidence shows there is neither a Section 30 nor a Section 31 in Township 12 North, Range 9 West of the 6th P. M. This accounts for Sections 25 and 36 in Township 12 North, Range 10 West of the 6th P. M., lying adjacent to and just west of Sections 29 and 32 in Township 12 North, Range 9 West of the 6th P. M. The few acres constituting these sections have been added to and are a part of Sections 29 and 32.

Silver Creek flows generally east in the north part of the northeast quarter of Section 36. When it approaches the east section line thereof it turns north to cross the north section line of Section 36 just west of the common

corner of Sections 25, 29, 32, and 36. It then proceeds to flow north near the east line of Section 25. After doing so for a distance of about 550 feet it turns east across the township line, which is the east section line of Section 25, onto Section 29. On Section 29 it flows east and north across the southwest quarter thereof in a meandering fashion, there being about 60 acres of the south half of the southwest quarter thereof south of the creek. This 60-acre tract is the land of appellants herein involved. It will, when convenient to do so, be referred to as the Mettenbrink land.

The evidence shows that until the Fagan ditch was dug, which occurred sometime before World War I (1917), any water flowing onto or falling on the Mc-Donald land would collect there in the low areas, which were east and south of the school located thereon, until a sufficient amount had accumulated to fill such low areas. It would then flow over the rim surrounding such low areas and flow north finding its way onto the Met-tenbrink land. A 4-foot bridge had been placed by the county in the east-west section road running between these lands to accommodate this flow. This bridge, which was 2 feet in depth, was placed about 800 feet east of the intersection lying to the west. When suffi-cient water had collected on the Mettenbrink land to fill up the low area thereon, which was about 10 acres, it would then flow over the bank of Silver Creek and into the stream. This flow over the bank thereof oc-curred somewhere east and north of where later a 3-foot cut was made in the bank as an outlet for the Fagan ditch.

The low areas on these lands left wet and swampy places. The exact extent thereof in the meadow on the McDonald land is not shown. To get rid of this condi-tion Pat Fagan, who was then managing and in charge of the McDonald land, entered into an agreement with Charles Mettenbrink, Sr. It was agreed Fagan could make a ditch across the Mettenbrink land from the

bridge located in the east-west road between the lands to Silver Creek and there make a cut in the bank thereof as an outlet, provided he would put a head bridge with an endgate control in the cut to prevent the water in Silver Creek from flowing back out of the stream onto the Mettenbrink land, would construct the ditch in such a manner that it could be crossed in farming, and would drain the 10 acres of low land on the Mettenbrink farm, which were located just west of the proposed ditch, into it. Sometime between 1911 and 1917, the exact date not being shown, Fagan dug such a ditch with a blade grader, made a 3-foot cut in the bank of Silver Creek at the place where the ditch entered it, put in a bridge with an endgate control in this cut, and drained the low area on the Mettenbrink land into this ditch. He then dug a ditch south and another southwest from the bridge. These ditches extended onto the Mc-Donald farm for some distance in order to drain the low areas located thereon. All ditches, both north and south from the east-west section line between the Mc-Donald and Mettenbrink lands, centered under the bridge located therein.

This ditch and control gate were kept in repair until about 1922. Thereafter the bridge in the section line was allowed to fill up and those in charge of the Mc-Donald land paid no further attention to the ditch on the Mettenbrink land and permitted the bridge with the endgate control to get out of repair. Sometime between 1930 and 1933 the county graded this section line and covered the bridge so no water could pass through the graded road.

In August 1940, appellants put in an irrigation well just west of their farmstead, which is located south of Silver Creek and on the southeast corner of their land. With this well they intended to irrigate the land lying south of the creek. This area slopes from the east and west toward the center. Therefore, in order to irrigate the west part of the land from this well, appellants

had to get water to the west side thereof. For this purpose they built a dike along the south edge of their land. The dike was about 1,200 feet long. It extended almost to the west section line. Appellants started it in 1940. In 1941 they built it to a height of about 2 feet at the center, that being the lowest part of their land crossed by the dike. The dike was not high enough to carry water to the west side of the land. . Consequently, the appellants caused the dike to be raised an additional 2 feet. This was done in July 1944. This proved to be adequate. Appellants then leveled the land to the north of the dike and thereafter irrigated it. This was accomplished by flowing water from both the east and west toward the center. They then filled in the cut in the creek bank, made when the Fagan ditch was dug, but, before doing so, put a metal tube in the cut in order to drain water that would come onto their lands from any source. However, no opening was made in the irrigation ditch. The ditch completely blocked out all water coming from the south as it was considerably higher than the graded section road to the south.

In 1945 some water collected on the Mader land. There being no opening in the road it could get no further. The county then, at appellees' request, put in a 2-foot metal culvert. It was located at the same point in the road as the former bridge. The water flowed through the culvert and into the ditch located north of the road. There being no opening in the irrigation dike it could go no further and stayed in the ditches. The water was not of sufficient quantity to do any harm to the Mader land.

Nothing further happened until 1949. Then Silver Creek overflowed onto Section 36. This, as far as the record discloses, was the first time it had done so since prior to 1918. This floodwater flowed east onto the Mader land but could get no further because appellants' irrigation dike prevented it from flowing onto the Met-

tenbrink land and then returning to Silver Creek from whence it had come.

It should here be stated that while there is a cut in the bank of Silver Creek in Section 36 caused by a cattle path, there is also a natural cut in the bank thereof caused by a natural drainage of waters into the creek and floodwaters flowing from either find their way east onto the Mader land.

Appellants were unwilling to open their irrigation ditch and let these waters through, the same covering about 20 acres of the Mader land. It destroyed the crops growing thereon. As a consequence appellees started this action on April 24, 1950, for the purposes already stated.

It should here be stated that while the allegations of the appellees' petition primarily relate to the existence of a watercourse and the trial court's decree specifically relates to the restoration thereof, the facts stated in appellees' petition are broad enough to cover all waters whether surface, flood, or those running in a watercourse. Since the findings of the trial court were generally for the appellees, we shall consider the petition accordingly.

By statute a watercourse is defined. as: "Any depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook shall be deemed a watercourse." § 31-202, R. R. S. 1943.

In Courter v. Maloley, 152 Neb. 476, 41 N. W. 2d 732, we quoted from Pyle v. Richards, 17 Neb. 180, 22 N. W. 370, the following: "To constitute a watercourse the size of the stream is not material. It must, however, be a stream in fact, as distinguished from mere surface drainage occasioned by freshets or other extraordinary causes, but the flow of water need not be continuous." Then we went on to say: "This characterization was approved in Snyder v. Platte Valley Public Power and Irrigation District, 144 Neb. 308, 13 N. W.

2d 160, 160 A. L. R. 1154; Jack v. Teegarden, 151 Neb. 309, 37 N. W. 2d 387; Pint v. Hahn, ante p. 127, 40 N. W. 2d 328; * * *."

And in Jack v. Teegarden, 151 Neb. 309, 37 N. W. 2d 387, we said: "Surface water is that which is diffused over the surface of the ground, derived from falling rains or melting snows, and continues to be such until it reaches some well-defined channel in which it is accustomed to and does flow with other waters, whether derived from the surface or springs, and it then becomes the running water of a stream and ceases to be surface water."

"Where surface water resulting from rain and snow flows in a well-defined course, whether it be a ditch, swale, or draw in its primitive condition, its flow cannot be arrested or interfered with by a landowner to the injury of neighboring proprietors." Ricenbaw v. Kraus, 157 Neb. 723, 61 N. W. 2d 350. See, also, Snyder v. Platte Valley Public Power & Irr. Dist., 144 Neb. 308, 13 N. W. 2d 160, 160 A. L. R. 1154; Graham v. Pantel Realty Co., 114 Neb. 397, 207 N. W. 680; Leaders v. Sarpy County, 134 Neb. 817, 279 N. W. 809; Pint v. Hahn, 152 Neb. 127, 40 N. W. 2d 328; Purdy v. County of Madison, 156 Neb. 212, 55 N. W. 2d 617.

" 'It is the duty of those who build structures across natural drainways to provide for the natural passage through such obstructions of all waters which may be reasonably anticipated to drain there, and this is a continuing duty.' Crummen v. Nemaha County, 118 Neb. 355, 224 N. W. 864." Leaders v. Sarpy County, supra.

"For such an injury injunction is the proper remedy, and equity looks to the nature of the injury inflicted, together with the fact of its constant repetition, or continuation, rather than to the magnitude of the damage inflicted, as the ground of affording relief." McGill v. Card-Adams Co., 154 Neb. 332, 47 N. W. 2d 912. See, also, Pospisil v. Jessen, 153 Neb. 346, 44 N. W. 2d 600.

But, as stated in Miksch v. Tassler, 108 Neb. 208, 187

N. W. 796: "* * * to constitute a watercourse the size or velocity of the stream is not material, but that it must, however, be a stream in fact as distinguished from mere temporary surface drainage occasioned by freshets or other extraordinary causes, although the flow of water need not be continuous or great in amount. Pyle v. Richards, 17 Neb. 180; Morrissey v. Chicago, B. & Q. R. Co., 38 Neb. 406; Town v. Missouri P. R. Co., 50 Neb. 768."

In Morrissey v. Chicago, B. & Q. R. R. Co., 38 Neb. 406, 56 N. W. 946, we quoted the following from Morrison v. Bucksport & B. R. R. Co., 67 Me. 353: "To constitute a water course, it must appear that the water usually flows in a particular direction; and by a regular channel, having a bed with banks and sides; and (usually) discharging itself into some other body or stream of water. It may sometimes be dry. It need not flow continuously; but it must have a well defined and substantial existence. * * * there is a broad distinction between a stream and brook, constituting a water course, and occasional and temporary outbursts of water occasioned by unusual rains or the melting of snows, flowing over the entire face of a tract of land, and filling up low and marshy places, and running over adjoining lands, and into hollows and ravines which are in ordinary seasons destitute of water and dry." See, also, Skolil v. Kokes, 151 Neb. 392, 37 N. W. 2d 616.

While the foregoing principles have often been announced by this court the fact remains that each case of this character must stand or fall upon the factual situation disclosed by the record. See Muhleisen v. Krueger, 120 Neb. 380, 232 N. W. 735.

The trial court viewed the premises. We have said: "When the trial court goes upon the premises in controversy, and makes a personal examination of the topography of all of the land and water involved, his findings in reference thereto are entitled to great weight." Independent Stock Farm v. Stevens, 128 Neb. 619, 259

N. W. 647. See, also, Whipple v. Nelson, 143 Neb. 286, 9 N. W. 2d 288; Keim v. Downing, *supra.*

But, as stated in Jack v. Teegarden, *supra:* " ' "The trial court is required to consider any competent and relevant facts revealed by a view of premises as evidence in the case, and a duty is imposed on this court on review of findings made by the trial court to give consideration to the fact that the trial court did view the premises; provided, that the record contains competent evidence to support the findings." ' Columbian Steel Tank Co. v. Vosika, 145 Neb. 541, 17 N. W. 2d 488."

The view made by the court could assist him in determining what the condition of the land was at the time he made it but could be very little help in determining what the condition thereof was prior to and at the time of the digging of the ditch by Fagan.

Here the evidence shows that occasionally outbursts of surface water, caused by heavy rains, flowed onto or collected on the Mader land, filled up the low and swampy places thereon, and then the overflow ran onto the adjoining Mettenbrink land to the north. After the section road between the lands was graded and a 4-foot bridge put in, this water would flow through the bridge. When the overflow reached the Mettenbrink land it would spread out and fill up the low areas thereon. When it had done so the surplus overflow would then flow over the south bank of Silver Creek and into the stream. We do not think this overflow from these low areas ever reached the stage where it could be said that it became part of a watercourse. The trial court was in error in this respect.

" 'The term "surface water" includes such as is carried off by surface drainage,—that is, drainage independently of a watercourse, * * *.' (Morrissey v. Chicago, B. & Q. R. R. Co., 38 Neb. 406, 56 N. W. 946.)" Courter v. Maloley, *supra.*

As to the flow of these surface waters, we have said: " 'The rule in this jurisdiction is that a proprietor may

defend himself against the encroachments of surface water by embankment or dike or otherwise and will not be liable in damages which may result from the deflection and repulsion defended against, provided that the proprietor in making defense on his own land himself exercised ordinary care and provided he so uses his own property as not to unnecessarily and negligently injure another.' Robinson v. Central Neb. Public Power & Irrigation District, 146 Neb. 534, 20 N. W. 2d 509." Skolil v. Kokes, *supra*. See, also, Muhleisen v. Krueger, *supra*; Warner v. Berggren, 122 Neb. 86, 239 N. W. 473; Robinson v. Central Nebraska Public Power & Irr. Dist., 146 Neb. 534, 20 N. W. 2d 509; Snyder v. Platte Valley Public Power & Irr. Dist., *supra*.

As stated in Bussell v. McClellan, 155 Neb. 875, 54 N. W. 2d 81: "It was also said (in Courter v. Maloley, 152 Neb. 476, 41 N. W. 2d 732): 'In this jurisdiction it is a general rule that surface waters may be controlled by the owner of the land on which they fall, or originate, or over which they flow and he may refuse to receive any that falls, or originates, or flows on or over adjoining land. His right in this respect however must be so exercised as not to unnecessarily or negligently cause injury to the rights and property of others.'"

The evidence discloses that appellants exercised ordinary care in constructing their irrigation dike and that they now use their property in a manner so as not to unnecessarily and negligently injure the appellees.

Sometime between 1911 and 1917, as has already been hereinbefore set forth, a permissive use was obtained from the owner of the Mettenbrink land to construct a ditch and make a cut in the bank of Silver Creek to flow this surplus water and drain the low swampy ground on the McDonald land. Did this permissive right to use ever develop into a prescriptive right? We do not think that it did.

"A permissive use of the land of another, that is a use or license exercised in subordination to the other's

claim and ownership, is not adverse and cannot give an easement by prescription no matter how long it may be continued." Stubblefield v. Osborn, 149 Neb. 566, 31 N. W. 2d 547.

The requirement for making a permissive use a prescriptive right is stated in Weisel v. Hobbs, 138 Neb. 656, 294 N. W. 448, as follows: "Possession by permission of the owner can never ripen into title by adverse possession until after such change of position has been brought home to the adverse party."

There is no evidence that such change of position was ever taken by the owner of appellees' land. In fact, the evidence shows the permissive use was abandoned beginning about 1922. That such may be done is fully established by opinions of this court. See, Williams v. Lantz, 123 Neb. 67, 242 N. W. 269; Lackaff v. Bogue, 158 Neb. 174, 62 N. W. 2d 889. See, also, Restatement, Property, § 504, p. 3076.

As stated in Williams v. Lantz, *supra*, quoting from 9 R. C. L., § 68, p. 812: " 'An easement may be abandoned by unequivocal acts showing a clear intention to abandon and terminate the right, or it may be done by acts in pais without deed or other writing. The intention to abandon is the material question, and it may be proved by an infinite variety of acts. It is a question of fact to be ascertained from all the circumstances of the case; and, as a rule, no one case can be authority for another. Time is not a necessary element; it is not the duration of the nonuser, but the nature of the acts done by the dominant owner, or of the adverse acts acquiesced in by him, and the intention which the one or the other indicates, that are important, and a cessation of use for a term less than the prescriptive period, accompanied by acts clearly indicating an intent to abandon the right, will work an extinguishment of the easement.' "

The permissive use having been abandoned by the McDonalds, the appellees would have no greater rights. See, Restatement, Property, § 487, p. 3034; Frye v. Sib-

bitt, 145 Neb. 600, 17 N. W. 2d 617. As stated in Restatement, Property, § 487, p. 3034: "The successor to the possession of a dominant tenement who, by succeeding to such possession, becomes entitled to the benefit of an appurtenant easement is subject to any qualifications or conditions attached to the easement. Though, as possessor, he becomes entitled to the privileges of use to which his predecessor was entitled and can do all his predecessor could, he can do no more."

Not only did the appellees make no claim to this permissive use but the evidence establishes they had no right thereto because it had been abandoned by the McDonalds. In fact, the appellees actually refused to accept an offer to renew such use, subject to the same conditions as originally attached, when made by appellants during the trial.

But let us assume, for the sake of discussion only, that a natural watercourse existed prior to the digging of the ditch, as appellees alleged and now contend it did. Even then we think appellees would have no right to now have it restored. That the right to a natural watercourse can be lost is evidenced by the holdings of this court. See, Whipple v. Nelson, *supra;* Johnk v. Union Pacific R. R. Co., 99 Neb. 763, 157 N. W. 918, L. R. A. 1916F 403; Reams v. Clopine, 87 Neb. 673, 127 N. W. 1070. As stated in Reams v. Clopine, *supra:* "The court merely modified the same by indicating that, even though the landowner had such a right, it might have been lost by the prior grant of an easement providing for the diversion of the waters, so that they drained through an artificial channel."

The evidence discloses that the water that backed up on the Mader land in June 1949 was overflow water from Silver Creek. It had flowed out of Silver Creek on Section 36. The fact that it had apparently come out of Silver Creek by flowing through a break in the bank thereof made by a cattle lane or path is not material for the evidence shows there is another break in the bank

of the creek a little to the west out of which it could and does flow when the creek overflows its banks, which break is the result of natural drainage. The topography of the land is such that these floodwaters would normally flow east over Section 36 onto the Mader land, then northeast over the Mettenbrink land, and return to Silver Creek. Appellants' dike, which was completed in 1944, completely crosses this flood plane and prevented the flow of this floodwater onto and over the Mettenbrink land. The evidence establishes the areas here involved on the Mader and Mettenbrink lands to be a part of the flood plane or channel of Silver Creek.

"The flood plane of a live stream is the adjacent lands overflowed in times of high water from which floodwaters return to the channel of the stream at lower points. This plane is regarded as a part of the channel and the water flowing within the channel or its flood plane is characterized as floodwater. Frese v. Michalec, 148 Neb. 567, 28 N. W. 2d 197; Hofeldt v. Elkhorn Valley Drainage District, 115 Neb. 539, 213 N. W. 832, 53 A. L. R. 1174; Cooper v. Sanitary District No. 1, *supra*; Stocker v. Wells, 150 Neb. 51, 33 N. W. 2d 445." Courter v. Maloley, *supra*.

"An easement by prescription can be acquired only by an adverse user for ten years, * * *." Roe v. Howard County, 75 Neb. 448, 106 N. W. 587, 5 L. R. A. N. S. 431.

"* * * in cases of this character the prescriptive right will not commence to run until some act or fact exists giving the party against whom the right is claimed a cause of action." Roe v. Howard County, *supra*. See, also, Schmutte v. State, 147 Neb. 193, 22 N. W. 2d 691.

There is no evidence of any floodwaters flowing in this part of the flood plane of Silver Creek at any time prior to 1949, except possibly on one or more occasions during the period from 1910 to 1918. The appellants had acquired no rights by prescription to obstruct these floodwaters. In the absence thereof the following principles apply:

· "The flood channel must be considered as a part of the channel of the stream and no structures or other obstructions can be placed in its bed which will have a tendency to dam the water back upon the property of upper riparian or adjacent owners." McGill v. Card-Adams Co., *supra*.

"It is the duty of those who build structures across natural drainways to provide for the natural passage through such obstruction of all waters which may be reasonably anticipated to drain there. This is a continuing duty." McGill v. Card-Adams Co., *supra*.

"The owners or proprietors of lands bordering upon either the normal or flood channels of a natural watercourse are entitled to have its water, whether within its banks or in its flood channel, run as it is wont to run according to natural drainage, and no one has the lawful right by diversions or obstructions to interfere with its accustomed flow to the damage of another." McGill v. Card-Adams Co., *supra*.

See, also, Ballmer v. Smith, 158 Neb. 495, 63 N. W. 2d 862.

The evidence shows the flood plane at the south edge of the Mettenbrinks' land, just north of the culvert in the east-west road, to be 1.4 feet above the bottom or flow line of the culvert. Appellants are required to make some type of opening through their irrigation dike at that level which will be reasonably adequate to permit floodwaters of Silver Creek, when flowing in this part of the flood channel thereof, to flow onto their land from the Mader land and then on into Silver Creek.

In view of the foregoing we reverse the decree of the trial court and remand the cause with directions to enter a decree in accordance herewith.

REVERSED AND REMANDED WITH DIRECTIONS.