THE HILLARY CORPORATION, A NEBRASKA CORPORATION, APPELLANT, V. UNITED STATES COLD STORAGE, INC., A FOREIGN CORPORATION, APPELLEE.

550 N.W.2d 889

Filed June 28, 1996.   No. S-94-887.

Thomas L. Saladino and Joseph A. Jordano, of Fitzgerald, Schorr, Barmettler & Brennan, P.C., for appellant.

Jeffrey D. Toberer and Jennifer W. Jerram, of Kennedy, Holland, DeLacy & Svoboda, for appellee.

CAPORALE, FAHRNBRUCH, WRIGHT, CONNOLLY, and GERRARD, JJ.

CONNOLLY, J.

The appellant, The Hillary Corporation (Hillary), brought this action seeking a declaratory judgment that it possesses an implied easement for railway access across the property of the appellee, United States Cold Storage, Inc. (U.S. Cold). Hillary also sought an injunction to prevent U.S. Cold from interfering with Hillary's use of the alleged easement. Hillary's claim for damages was reserved for trial at a later date.

The district court for Douglas County found that Hillary's predecessor in interest formerly possessed an implied easement for railway access across U.S. Cold's property. However, the court dismissed Hillary's petition, finding that the implied easement did not exist at the time the property was transferred to Hillary. Hillary appeals.

From our de novo review, we determine that Hillary's predecessor in interest possessed an implied easement for railway access across U.S. Cold's property and did not intend to abandon the easement. Thus, we determine that the implied easement existed when the property was transferred to Hillary. We further determine that Hillary did not intend to abandon the easement. As a result, we conclude that Hillary possesses an implied easement for railway access across the property of U.S. Cold. We therefore reverse, and remand for further proceedings.

## I. ASSIGNMENTS OF ERROR

Hillary alleges the district court erred in (1) finding that the easement did not exist when Hillary's predecessor in interest transferred the property to Hillary, (2) determining that the rail tracks must be necessary for the enjoyment of the dominant parcel and that the use of the easement be continuous in order for an implied easement to remain in existence, (3) applying standards for creation or establishment of an implied

easement to determine the question of whether an easement by implied grant was still in existence upon retransfer of the property, (4) failing to make a finding of fact that the easement was used within 10 years prior to the filing of Hillary's petition, (5) failing to make a finding of fact that Hillary and its predecessors in interest had no intention of abandoning the easement and did not abandon the easement, (6) finding that the tracks were serviced only until April 21, 1981, and (7) finding that the last use of the tracks according to the notes of a predecessor in interest was in February 1980.

## II. BACKGROUND

Below is a sketch of the parcels of land involved. The sketch is for illustrative purposes only and does not purport to be drawn to scale. See *Winkle v. Mitera*, 195 Neb. 821, 241 N.W.2d 329 (1976).

The parcels of property identified as A and B are owned by the appellee, U.S. Cold, a New Jersey corporation. Parcel A contains a shop building and parcel B contains a warehouse. Parcel C, which lies to the north of parcels A and B, contains a warehouse and is owned by the appellant, Hillary, a Nebraska corporation.

Parcel C adjoins parcels A and B, divided only by G Street. The railroad tracks which are the subject of the alleged implied easement run southerly across parcel C, cross G Street, and then run southeasterly across parcel B. A portion of the track runs across a 20-foot-wide strip of land along the southern boundary of parcel A.

### 1. OVERVIEW OF REAL ESTATE TRANSFERS

An overview of the pertinent real estate transfers is necessary to an understanding of this action. Kay Omaha Livestock Market, Inc. (Kay Omaha), formerly known as Union Stockyards Company, continually owned parcels A, B, and C from 1918 until 1975. Harold Norman, retired secretary and treasurer of the former Union Stockyards, testified that the railroad tracks were built by Union Stockyards in 1952 and were used by the company to haul grain to its warehouses. On February 28, 1975, Kay Omaha sold parcel A to U.S. Cold. On April 21, 1976, Kay Omaha sold parcel C to Stewart Seed Company. In October 1976, the chain of title of parcel B went from Kay Omaha to Omaha Holdings, Inc., then passed to William Chapman in May 1977, and finally to U.S. Cold in November 1977. In 1988, Stewart Seed Company deeded parcel C to Leora Fuller, one of the principals of Stewart Seed. In 1992, James Krueger formed Hillary and purchased parcel C from Fuller.

When Kay Omaha sold parcel A to U.S. Cold in 1975, it expressly reserved for itself, its successors, and its assigns a permanent easement to run with the land across the 20-foot-wide strip along the southern boundary of parcel A. This easement was for the express benefit of parcels B and C, which were still owned by Kay Omaha at that time. Accordingly, there is no dispute that U.S. Cold took parcel A

subject to an express easement for the benefit of the owners of parcels B and C.

However, no express easement for railway access across parcel B, for the benefit of parcel C, was ever reserved throughout the chain of title of parcel B. Bill Kratvill, the current vice president of Autoliner Corporation, testified that he personally operated railroad cars over the tracks on parcels B and C from 1971 through 1976. Dan Reeder, listing agent for Kay Omaha, testified that when he listed parcel C for sale in 1976, he advertised the property as having rail access. Fuller testified that the existence of the tracks, and the right to bring railroad cars in and out over those tracks, were of prime importance in Stewart Seed's decision to acquire parcel C. The deed and the bill of sale for parcel C, conveyed to Stewart Seed from Kay Omaha, contained an express conveyance of the rail tracks on the property from the south line of G Street. These documents do not mention an easement for rail access across parcel B.

The district court found that U.S. Cold "was aware of the possibility of an easement in favor of Stewart [Seed]" when it entered into an agreement with Chapman in 1977 for the purchase of parcel B. U.S. Cold had the choice to elect between receiving one of two types of deeds. It could choose to receive a deed that was expressly subject to the Stewart Seed implied easement, or could choose to receive a deed that did not mention the implied easement, but only if U.S Cold gave Chapman an indemnity for any claims made by Stewart Seed. U.S. Cold elected to receive a deed that did not mention the Stewart Seed implied easement.

After acquiring parcel B in 1977, U.S. Cold rebuilt the tracks on its property from double spur tracks into a single spur track. U.S. Cold then installed a switch to connect the single spur track to the double spur tracks running across G Street to parcel C.

## 2. TESTIMONY ON LAST USE OF TRACKS

Don Barnett testified that his company was a tenant of Stewart Seed from 1979 to sometime in 1981 and that an estimated 30 to 40 carloads of product came to his company via

the tracks. Fuller's notes showed that the tracks were last used in February 1980. However, Fuller testified that Stewart Seed and/or its tenants used the tracks "from 1979 through 1983 and then, as I recall, there was a couple of more cars in like '84 or '85." On cross-examination, Fuller testified that the tracks were used "from 1976 to 1983 for sure, and I think 1984 and '85." However, upon further cross-examination, Fuller stated that she did not have the records showing usage of the track in 1983 or after and that the Brandon railroad would have those records.

Records of the Brandon Corporation, the railroad company that serviced the tracks, showed use of the tracks approximately 54 times between May 1979 and April 1981. On direct examination, Bob Antczak, president of the Brandon Corporation, stated that he did not have records after 1981 and therefore could not say whether any cars were moved over the tracks after 1981.

Fil Catania, one of Stewart Seed's tenants, was asked on direct examination, "[W]hat was the last year that you can recall receiving a car on the spur track?" Catania stated, "Between '80 and '83, '84, somewhere in there." Hillary's counsel then read the testimony that Catania gave when he was deposed by U.S. Cold's counsel. Catania's deposition testimony indicated that he used the tracks sometime prior to 1988, but that he was less than certain about the exact year he last used the tracks.

In its order, the district court found that the tracks were not used "after 1981 or so."

### 3. Testimony on Intent to Abandon

At trial, Fuller testified that she never intended to abandon the right to use the tracks. The advertisement Stewart Seed ran for parcel C from 1988 to 1992 listed the property for sale with rail trackage.

Adrian Woltkamp, former vice president of U.S. Cold, testified, and the district court found, that U.S. Cold "paid the costs of rebuilding and has paid the cost for the maintenance of the tracks with no contribution from Stewart [Seed], though Stewart [Seed] was asked to do so." The only evidence

adduced at trial was that in 1977, Stewart Seed refused to compensate U.S. Cold for reconstructing the tracks from two parallel tracks to a single track. Kratvill testified that when he last used the tracks in 1976, they were in adequate condition.

In 1985, U.S. Cold installed a security fence and padlocked gates across the northern boundary of its property. The fence and gates crossed the railroad tracks, thereby blocking use of the tracks to the north. The record reflects that the fence that was constructed contained a swinging gate large enough for a train to pass through.

In July 1992, U.S. Cold began removing the railroad tracks and ties on its property and began laying asphalt on the area. In December 1992, Hillary purchased parcel C from Fuller. There is no mention of an easement for rail access in the deed. Upon learning from U.S. Cold that it was U.S. Cold's belief that no easement existed over parcel B for the benefit of Hillary, Hillary renegotiated the price of parcel C with Fuller. Krueger, president of Hillary, testified that he planned to repair the tracks upon parcel C. After taking title to parcel C, Hillary filed this suit to establish the existence of an implied easement for rail access over parcel B.

## III. STANDARD OF REVIEW

In reviewing an equity action for a declaratory judgment, an appellate court tries factual issues de novo on the record and reaches a conclusion independent of the findings of the trial court, *Clemens v. Harvey*, 247 Neb. 77, 525 N.W.2d 185 (1994), and *Jaksha v. Thomas*, 243 Neb. 794, 502 N.W.2d 826 (1993), subject to the rule that where credible evidence is in conflict on material issues of fact, the reviewing court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another, *Engelhaupt v. Village of Butte*, 248 Neb. 827, 539 N.W.2d 430 (1995), and *Gas 'N Shop v. City of Kearney*, 248 Neb. 747, 539 N.W.2d 423 (1995).

## IV. ANALYSIS

### 1. WHETHER IMPLIED EASEMENT FROM FORMER USE WAS CREATED AT TIME PROPERTY WAS SUBDIVIDED

In its order, the district court found that Stewart Seed acquired an implied easement for use of the rail tracks over parcel B when it purchased parcel C from Kay Omaha in 1976. This court most recently addressed the elements required to create an implied easement from former use in *Hengen v. Hengen*, 211 Neb. 276, 318 N.W.2d 269 (1982). In that case, the court held:

> An easement by implication from former use arises only where [1] the use giving rise to the easement was in existence at the time of the conveyance subdividing the property; [2] the use has been so long continued and so obvious as to show that it was meant to be permanent; and [3] the easement is necessary for the proper and reasonable enjoyment of the dominant tract.

*Id.* at 284, 318 N.W.2d at 274.

#### (a) Timeframe

In order to determine whether an implied easement from former use was created, we must first ascertain what point in time to look to when making this determination. The directive announced in *Hengen v. Hengen, supra*, is to look to "the time of the conveyance subdividing the property." Prior to 1975, Kay Omaha owned parcels A, B, and C. We must determine whether the "conveyance subdividing the property" was February 28, 1975, when Kay Omaha conveyed parcel A to U.S. Cold, or April 21, 1976, when Kay Omaha conveyed parcel C to Stewart Seed.

When Kay Omaha conveyed parcel A to U.S. Cold on February 28, 1975, it expressly reserved for itself, its successors, and its assigns a permanent easement for the use of the rail tracks across the 20-foot-wide strip along the southern boundary of parcel A. Thus, there is no dispute that U.S. Cold took parcel A subject to an express easement for the benefit of Kay Omaha and the successors in interest to parcels B and C. At the time parcel A was conveyed to U.S. Cold, Kay

Omaha still owned parcels B and C. Thus, there was no dispute about Kay Omaha's right to use the tracks over parcel B at that time.

Kay Omaha's conveyance of parcel C to Stewart Seed marked the first time that parcels B and C were not under common ownership. Thus, it was this "conveyance subdividing the property" that first brought into question whether an implied easement for use of the tracks over parcel B was created. As a result, we conclude the time we must look to, in order to determine whether the elements required to create an implied easement were met, is when Kay Omaha conveyed parcel C to Stewart Seed on April 21, 1976.

### (b) Continuous and Obvious Use

In its order, the district court found that "the rail tracks had been in use for over twenty (20) years at the time Union Stockyards [Kay Omaha] began subdividing the property" and that "[a]t the time [Stewart Seed] acquired the property . . . the tracks were obvious and so was the . . . use of the tracks." At trial, Norman, retired secretary and treasurer of the former Union Stockyards, testified that the tracks were built by Union Stockyards in 1952, and were used by the company to haul grain to its warehouses. Kratvill, the current vice president of Autoliner Corporation, testified that he personally operated railroad cars over the tracks on parcels B and C from 1971 through 1976. Thus, we determine that the use giving rise to the easement was in existence, and had been so long continued and so obvious as to show that it was meant to be permanent, at the time Kay Omaha conveyed parcel C to Stewart Seed. See *Hengen v. Hengen, supra.*

### (c) Whether Some Degree of Necessity Is Required to Establish Implied Easement From Former Use

Although the district court found that the use of the tracks was continuous and obvious, the court did not make a finding whether the alleged easement was "necessary" for Stewart Seed's use and enjoyment of parcel C at the time it acquired the property. Hillary argues that proof that the alleged easement was necessary for the use and enjoyment of the property is not an essential element for creation of an implied ease-

ment. Conversely, U.S. Cold argues that necessity is an essential element for creation of an implied easement and that Hillary failed to prove the alleged easement was necessary for Stewart Seed's use and enjoyment of parcel C at the time the property was acquired. In an attempt to support its position, Hillary cites *Price Realty Co. v. Airport Authority*, 175 Neb. 791, 124 N.W.2d 207 (1963), in which this court recognized that there are two types of implied easements: (1) those that arise as an element of necessity or (2) those that arise from what has been said or done by the parties to the transaction. At issue in *Price Realty Co.* was whether an easement by necessity was created. In the instant case, Hillary asserts that the claimed easement from former use falls into the category of implied easements that arise from what has been said or done by the parties to the transaction, and thus, proof of necessity is not required.

Hillary is correct that the alleged easement fits into the category of implied easements that arise from what has been said or done by the parties to the transaction, i.e., from former use. However, it does not follow that no degree of necessity is required to be proved in order to establish an implied easement from former use.

When the *Price Realty Co.* court listed easements that arise as an element of necessity as being one of two types of implied easements, it was referring to easements that arise as a result of a strict (absolute) necessity. This court has repeatedly stated that " ' "[a] way of necessity usually arises where there is a conveyance of a part of a tract of land of such nature and extent that either the part conveyed or the part retained is entirely surrounded by the land from which it is severed or by this land and the land of strangers. . . ." ' " *Johnson v. Mays*, 216 Neb. 890, 895, 346 N.W.2d 401, 404 (1984). Accord, *Hansen v. Smikahl*, 173 Neb. 309, 113 N.W.2d 210 (1962); *Badura v. Lyons*, 147 Neb. 442, 23 N.W.2d 678 (1946). Generally, when this court alludes to implied easements that arise by necessity, we are referring to easements that are created to reach land that is otherwise landlocked and could not be utilized. As a result, *Price Realty Co., supra*, does not stand for the proposition that no degree of necessity is

required to be proved in order to establish an implied easement from former use, as Hillary asserts.

In furtherance of its position, Hillary cites *Fremont, E. & M. V. R. Co. v. Gayton*, 67 Neb. 263, 267, 93 N.W. 163, 164 (1903), in which this court stated:

> A distinction is doubtless to be made between cases where the easement so created is obvious and permanent and those where it is not equally open and visible to the purchaser. In the latter class of cases, it is usually held that the easement must be reasonably necessary to the enjoyment of that portion of the land for which it is claimed, or else must be reserved in the deed. [Citation omitted.] But where the easement is attended by some alteration in the land, which in its nature is obvious and permanent and may be seen on inspection by any person who views the land, it is not required that it be necessary nor that it be expressly reserved.

While it is true this excerpt supports Hillary's position, this court has held since *Gayton* that proof of some degree of necessity is required to establish an implied easement from former use. In *Christensen v. Luehrs*, 133 Neb. 50, 53, 273 N.W. 839, 841 (1937), the court held:

> "Where the owner of an entire tract of land or of two or more adjoining parcels employs a part thereof so that one derives from the other a benefit or advantage of a continuous and apparent nature, and sells the one in favor of which such continuous and apparent quasi easement exists, such easement being *necessary* to the reasonable enjoyment of the property granted, will pass to the grantee by implication. . . ."

(Emphasis supplied.)

As previously stated, in *Hengen v. Hengen*, 211 Neb. 276, 284, 318 N.W.2d 269, 274 (1982), it was held:

> An easement by implication from former use arises only where [1] the use giving rise to the easement was in existence at the time of the conveyance subdividing the property; [2] the use has been so long continued and so obvious as to show that it was meant to be permanent;

and [3] the easement is *necessary* for the proper and reasonable enjoyment of the dominant tract.

(Emphasis supplied.)

Considering the two lines of cases, we determine the better view sustains the rule that some degree of necessity must be proved before an implied easement from former use will be found to exist over land owned by another. Thus, to the extent that *Fremont, E. & M. V. R. Co. v. Gayton, supra*, stands for the proposition that no degree of necessity is required to establish an implied easement from former use, it is overruled.

### (d) Degree of Necessity Required to Establish Implied Easement From Former Use

U.S. Cold argues that the degree of necessity required to be proved in order to establish an implied easement from former use is "strict or absolute necessity." In support of this position, it cites *Chalen v. Cialino*, 206 Neb. 106, 291 N.W.2d 256 (1980); *Meier v. Maguire*, 172 Neb. 52, 108 N.W.2d 397 (1961); and *Badura v. Lyons, supra*. U.S. Cold correctly asserts that the court in *Badura* and *Chalen* required proof of strict necessity. However, U.S. Cold overlooks the fact that the issue in those two cases was not whether an implied easement from former use was created.

The issue in *Badura* was whether an easement by necessity was created. As discussed previously, easements by necessity arise when land is otherwise landlocked, and thus are distinguishable from easements that arise from former use. In *Badura*, the court stated that "ways of necessity are ways of strict necessity as distinguished from ways of mere convenience [citations omitted]; and that the degree of necessity requisite to support such a way is an absolute necessity, for which inconvenience without more does not suffice." 147 Neb. at 450, 23 N.W.2d at 684.

The issue in *Chalen* was whether an implied easement by reservation was created. In *Bennett v. Evans*, 161 Neb. 807, 74 N.W.2d 728 (1956), this court made it clear that there is a well-recognized distinction between implied grants and implied reservations in that the rule of strict necessity is applied to implied reservations, but not to implied grants.

(Citing *Lampman v. Milks*, 21 N.Y. 505 (1860).) As a result, we determine that *Badura* and *Chalen* are distinguishable from the instant case in that those cases did not arise in the context of an implied easement from former use.

As in the instant case, the issue in *Meier v. Maguire, supra*, was whether an implied easement from former use was created. Headnote 3 of that opinion supports U.S. Cold's position that strict necessity must be proved in order to establish an implied easement from former use. However, a close reading of the opinion exposes headnote 3 as being inconsistent with what the court actually stated in the body of the opinion. In the opinion, the court discusses *Bennett v. Evans, supra*, and then declares, "As we stated in that case, implied grants [easements arising from former use] are not favored, although they are more favored than implied reservations. The factor of necessity is involved in both." 172 Neb. at 56-57, 108 N.W.2d at 400.

While the *Meier* court did state that necessity is a factor to be considered in both implied reservations and implied grants, it did not state, or even imply, that the requisite degree of necessity is the same in both. Furthermore, the fact that the court declared that implied grants are "more favored than implied reservations" indicates that a lesser degree of necessity is required to be proved for implied grants than is required for implied reservations. Moreover, the opinion cites numerous times with approval to *Bennett v. Evans, supra*, in which the court stated that " 'the rule of strict necessity is applied to implied reservations but not to implied grants. . . .' " 161 Neb. at 820, 74 N.W.2d at 736. As a result, we find that headnote 3 cannot be reconciled with the opinion.

A court's opinion controls its syllabus, the syllabus being merely explanatory of the opinion and having no more force and effect than the statements made in the opinion on which the syllabus is based. *Maxwell v. Hamel*, 138 Neb. 49, 292 N.W. 38 (1940). Black's Law Dictionary 1449 (6th ed. 1990) includes "headnote" in its definition of syllabus and goes on to state that "[o]rdinarily, where a headnote, even though prepared by the court, is given no special force by statute or rule of court, the opinion is to be looked to for the original and

authentic statement of the grounds of decision" (citing *Burbank v. Ernst*, 232 U.S. 162, 34 S. Ct. 299, 58 L. Ed. 551 (1914)). As a result, we find that *Meier* does not support U.S. Cold's position that strict necessity must be proved in order to establish an implied easement from former use.

In *Christensen v. Luehrs*, 133 Neb. 50, 54, 273 N.W. 839, 841 (1937), this court stated:

> Some authorities hold . . . that an easement will not pass by implication except in cases of strict necessity, while others hold that an easement by implied grant can only arise in case of necessity. *The weight of authority and better view sustain the rule that the degree of necessity is such merely as renders the easement necessary for the convenient and comfortable enjoyment of the property as it existed when the severance was made, and that it should not be absolutely necessary for the enjoyment of the estate granted.*

(Emphasis supplied.)

Likewise, in *Hengen v. Hengen*, 211 Neb. 276, 284, 318 N.W.2d 269, 274 (1982), this court stated that to prove the existence of an implied easement from former use, "the easement is necessary for the *proper and reasonable enjoyment* of the dominant tract." (Emphasis supplied.) As a result, we conclude the degree of necessity required to prove the existence of an implied easement from former use is "reasonable necessity."

### (e) Whether Alleged Easement Was Reasonably Necessary for Use and Enjoyment of Property

U.S. Cold argues that use of the tracks across parcel B was not reasonably necessary for Stewart Seed's use and enjoyment of its land (parcel C) because evidence was adduced at trial that demonstrated that parcel C was accessible via use of trucks on public streets. This court has never reviewed a case involving an alleged easement for rail access. See *Burke Warehouse, Inc. v. Thanas*, 358 Mass. 823, 267 N.E.2d 917 (1971). However, in *Hengen v. Hengen, supra*, this court addressed whether the owners of the southwest quarter of a section of land had an implied easement, arising from use

before severance of the section, to obtain irrigation water from a canal in the northwest quarter. The court found an implied easement existed, stating that "[t]he necessity involved . . . is to transport the irrigation water from the canal in the northwest quarter to the southwest quarter . . . ." 211 Neb. at 284, 318 N.W.2d at 275.

Thus, the *Hengen* court found the easement was necessary for the proper and reasonable enjoyment of the dominant tract without discussing possible alternative methods of transporting the irrigation water. U.S. Cold's argument, that the necessity element was not met because of the existence of possible alternative methods of transportation, is an argument grounded in strict necessity instead of the reasonable necessity standard applicable in the instant case.

The testimony adduced at trial showed that the tracks across parcel B were part of the main rail line created by Union Stockyards and were the only available access to the tracks across parcel C. Obviously, this easement was reasonably necessary for Stewart Seed's convenient and comfortable use and enjoyment of parcel C at the time parcels B and C were subdivided. See, *Hengen v. Hengen, supra*; *Christensen v. Luehrs, supra*. As a result, we find that Stewart Seed acquired an implied easement from former use, for use of the rail tracks across parcel B, upon its acquisition of parcel C on April 21, 1976.

### 2. WHETHER IMPLIED EASEMENT EXISTED WHEN HILLARY PURCHASED PROPERTY

Although the district court found that Stewart Seed acquired an implied easement over U.S. Cold's property (parcel B), it went on to find that "the implied easement of rail access was not in existence when Leora Fuller transferred the property to Hillary." As a result, the district court dismissed Hillary's petition. The court reasoned that because the elements necessary for creation of an implied easement did not exist at the time Stewart Seed conveyed parcel C to Fuller, the implied easement did not exist at the time Fuller transferred parcel C to Hillary.

### (a) Conveying Dominant Tenement

Clearly, the district court reached its conclusion based on its belief that in order for an implied easement to remain in existence upon a subsequent conveyance, the elements necessary for the creation of an implied easement must be met at the time of each conveyance in the chain of title.

However,

> when an easement, although not originally belonging to an estate, has become appurtenant to it either by grant or prescription, a conveyance of that estate will carry with it such easement whether mentioned in the deed or not, although it may not be necessary to the enjoyment of the estate by the grantee.

*Cole v. Bradbury*, 86 Me. 380, 384, 29 A. 1097, 1098 (1894). See, also, 7 Thompson on Real Property § 60.07(b)(1) (Thomas ed. 1994); *Smith v. Garbe*, 86 Neb. 91, 98, 124 N.W. 921, 924 (1910) (" '[a]n easement appurtenant to land will pass by a conveyance, although the words "with the appurtenances" are not used . . .' "); *Vanderwerff v. Consumers Gas Co.*, 166 Pa. Super. 358, 362, 71 A.2d 809, 811 (1950) ("[e]asements by implication require no deed or writing to support them and they pass by a conveyance of the estates to which they are appurtenant. . . . But under all of the authorities an implied easement can *arise* only where the servitude is of a permanent nature, continuous, and sufficiently apparent to give notice of its existence" (emphasis supplied) (emphasis omitted)); *Broadhead v. Terpening*, 611 So. 2d 949, 954 (Miss. 1992) (" '[e]asements by necessity and by implication are appurtenant to the dominant estate and run with land' ").

In other words, once it is determined that the elements required for the creation of an implied easement existed at the time of the conveyance subdividing the property, the easement becomes appurtenant to the property and the elements for creation are no longer relevant to a determination of the continued existence of that easement upon a subsequent conveyance.

U.S. Cold cites *Agnew v. City of Pawnee City*, 79 Neb. 603, 113 N.W. 236 (1907), in support of the district court's determination that the elements necessary for creation of an implied

easement must exist at the time of each conveyance in the chain of title.

In that case, a building was constructed along the outer boundary of a lot bordering a public street. A stairway rising to the second floor of the building was constructed on the street. Under the applicable law of that time period, the court determined that the building owner had acquired an easement by adverse possession in the portion of the street occupied by the stairway. The stairway was subsequently removed. Four years after the removal, the building was sold to Agnew, who reconstructed the stairway.

The city sought to remove the stairway, arguing essentially that the easement did not exist at the time Agnew purchased the property because its use was not continuous, obvious, and necessary at that time. The court held,

> This rule seems to apply more particularly to the creation of easements by implied grant upon the severance of the estate; but, conceding its applicability to the case in hand, we think the easement in question was apparent to an ordinary observer and naturally and necessarily belonged to the premises.

79 Neb. at 607, 113 N.W. at 237.

We conclude the court was correct in stating that the application of these elements "seems to apply more particularly to the creation of easements by implied grant upon the severance of the estate," and that it was incorrect in applying these elements at the time of the conveyance to Agnew. Thus, to the extent that *Agnew v. City of Pawnee City* stands for the proposition that the elements required to create an implied easement must exist at the time of a subsequent conveyance in order for the easement to survive the conveyance, it is overruled.

Once an implied easement is created, it becomes appurtenant to the dominant tenement and remains in existence upon a subsequent conveyance unless and until it is somehow terminated. See *Beloit Foundry Co. v. Ryan*, 28 Ill. 2d 379, 388, 192 N.E.2d 384, 390 (1963) ("[a]n easement appurtenant passes by conveyance of the land to which it is annexed, even without being expressly mentioned, and the servient estate continues to be subject thereto until such right is terminated

or abandoned"). See, also, 7 Thompson on Real Property § 60.07(b)(1) (Thomas ed. 1994).

The only theory pled by U.S. Cold that the easement in the instant case was terminated is that it was abandoned. Thus, in order to determine whether the implied easement existed at the time Fuller transferred parcel C to Hillary, we must determine whether Stewart Seed or Fuller abandoned the easement.

### (b) Abandonment

Abandonment of an easement must be pled and proved, the burden of proof being on the party alleging it. *Masid v. First State Bank*, 213 Neb. 431, 329 N.W.2d 560 (1983); *Agnew v. City of Pawnee City*, 79 Neb. 603, 113 N.W. 236 (1907). Nonuse of an easement for a period less than the prescriptive period of 10 years will not itself work an abandonment of the easement. *Agnew v. City of Pawnee, supra*. However, nonuse of an easement for a period less than the prescriptive period, accompanied by acts clearly indicating an intention to abandon the right, will work an extinguishment of the easement. *Mader v. Mettenbrink*, 159 Neb. 118, 65 N.W.2d 334 (1954); *Williams v. Lantz*, 123 Neb. 67, 242 N.W. 269 (1932).

An intention to abandon an easement cannot be inferred from the mere fact that the easement was not used for a period of years in excess of the prescriptive period. See, *Masid v. First State Bank, supra*; *Agnew v. City of Pawnee City, supra*. However, nonuse of an easement for a period sufficient to create an easement by prescription will raise a presumption to defeat the right, but this nonuse is open to explanation and may be rebutted by proof that the owner had no intention to abandon his easement while thus omitting to use it. *Masid v. First State Bank, supra*; *Agnew v. City of Pawnee City, supra*.

Thus, in order to determine whether Hillary's predecessors in interest abandoned the implied easement, we must first determine whether the predecessors, at some point in time between the creation of the easement and when Hillary acquired parcel C, failed to use the easement for a period of years in excess of the 10-year prescriptive period. If they used the easement within the prescriptive period, then the burden of proving that the predecessors intended to abandon the ease-

ment is on U.S. Cold. If they did not use the easement within the prescriptive period, then a presumption of abandonment arises and the burden of rebutting the presumption, by proving that the predecessors did not intend to abandon the easement, is on Hillary. See, *Masid v. First State Bank, supra*; *Agnew v. City of Pawnee City, supra*.

### (c) Whether Hillary's Predecessors in Interest Used Tracks Within 10 Years of Date Hillary Purchased Property

In its order, the district court found that Hillary's predecessors in interest did not use the track "after 1981 or so." The court reasoned:

> The last use of the tracks, according to Leora Fuller's notes . . . was February, 1980 and both Donald Barnett of the Barnett Corporation and Robert Antczak show track usage in 1981. Ms. Fuller and Fil Catania stated that they thought there was track usage in 1983, but no records were produced at trial to support this.

According to the records produced at trial, the last use of the tracks took place in April 1981. While it is not necessary that the evidence adduced on the last use of the tracks be in the form of written records, we find the testimony adduced on the use of the tracks after April 1981 to be less than persuasive. Thus, considering and giving weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another, we find that the tracks were last used in 1981. See, *Engelhaupt v. Village of Butte*, 248 Neb. 827, 539 N.W.2d 430 (1995); *Gas 'N Shop v. City of Kearney*, 248 Neb. 747, 539 N.W.2d 423 (1995).

Hillary bought parcel C on December 1, 1992. Thus, we conclude that Hillary's predecessors in interest failed to use the tracks for a period of years in excess of the 10-year prescriptive period. As a result, the presumption arises that Hillary's predecessors in interest abandoned the tracks, and thus, Hillary bears the burden of rebutting the presumption by proving that its predecessors did not *intend* to abandon the tracks. See, *Masid v. First State Bank, supra*; *Agnew v. City of Pawnee City, supra*.

(d) Whether Hillary's Predecessors in Interest
Intended to Abandon Implied Easement

" 'An easement may be abandoned by unequivocal acts showing a clear intention to abandon and terminate the right, or it may be done by acts in pais without deed or other writing. The intention to abandon is the material question, and it may be proved by an infinite variety of acts. It is a question of fact to be ascertained from all the circumstances of the case . . . .' "
*Mader v. Mettenbrink*, 159 Neb. 118, 130, 65 N.W.2d 334, 343 (1954) (quoting *Williams v. Lantz*, 123 Neb. 67, 242 N.W. 269 (1932)).

Hillary argues that its predecessors in interest had no intention of abandoning the implied easement. At trial, Fuller unequivocally testified that she never intended to abandon the right to use the tracks. Furthermore, after Fuller acquired parcel C, she advertised it for sale, at all times, as having rail access.

U.S. Cold argues that the following factors illustrate that Stewart Seed and/or Fuller intended to abandon the implied easement: (1) nonuse of the tracks from 1981 forward; (2) refusal to pay for any portion of maintenance, repairs, or replacement of the tracks; (3) acquiescence in the installation of a fence and padlocked gates across the tracks; and (4) failure to expressly convey the implied easement to their respective grantees.

As for factor (1), in determining whether there was an intent to abandon an easement, " ' "[t]ime is not a necessary element; it is not the duration of the nonuser, but the nature of the acts done by the dominant owner, or of the adverse acts acquiesced in by him, and the intention which the one or the other indicates, that are important . . . ." ' " *Mader v. Mettenbrink*, 159 Neb. at 130, 65 N.W.2d at 343 (quoting *Williams v. Lantz, supra*). As stated in *Masid v. First State Bank*, 213 Neb. 431, 435-36, 329 N.W.2d 560, 563 (1983):

It is true the evidence is that the land to which the easement is appurtenant was vacant for a period of 11 or 12 years. However, this circumstance, in and of itself, does not establish abandonment. . . . [T]he plaintiff herein did

not by his own act render the use of the easement impossible, nor did he obstruct it in a manner inconsistent with its further enjoyment. There is no abandonment in this case . . . .

Regarding factor (2), the only evidence adduced at trial was that in 1977 Stewart Seed refused to compensate U.S. Cold for reconstructing the tracks on parcel B from two parallel tracks to a single track. Kratvill testified that when he last used the tracks in 1976, they were in adequate condition. Thus, Hillary argues that this reconstruction project was an unnecessary, unilateral activity by U.S. Cold and that its predecessors did not contribute because they were of the opinion that the tracks did not need to be reconstructed.

Considering factor (3), the record reflects that the fence that was constructed contained a swinging gate large enough for a train to pass through. See, *Spiegel v. Ferraro*, 142 A.D.2d 573, 529 N.Y.S.2d 908 (1988); *DeJong v. Abphill Assoc.*, 121 A.D.2d 678, 504 N.Y.S.2d 445 (1986) (failure of owner of dominant estate to act to have removed an obstruction placed on easement by owner of servient estate did not establish abandonment).

As for factor (4), in *Ballinger v. Kinney*, 87 Neb. 342, 345, 127 N.W. 239, 240 (1910), this court held, "The easement, being appurtenant, passe[s] by . . . deed . . . notwithstanding said instrument contains no reference thereto." See, also, section IV(2)(a) on "Conveying Dominant Tenement," *supra*.

We find that these factors, as a whole, do not rebut the evidence presented by Hillary—that its predecessors in interest did not intend to abandon the tracks. We further find that Hillary did not obstruct the easement in any manner or acquiesce in any acts inconsistent with its further enjoyment of the easement. See, *Masid v. First State Bank, supra*; *First Investment Co. v. State Fire Marshal*, 175 Neb. 66, 120 N.W.2d 549 (1963); *Toelle v. Preuss*, 172 Neb. 239, 109 N.W.2d 293 (1961). See, also, *Lackaff v. Bogue*, 158 Neb. 174, 62 N.W.2d 889 (1954). Thus, we determine that Hillary met its burden of rebutting the presumption of abandonment by proving that it was more likely than not that its predecessors in interest did not intend to abandon the easement. As a

result, we conclude the implied easement existed at the time Fuller conveyed parcel C to Hillary.

### (e) Whether Hillary Intended to Abandon Implied Easement

Finally, U.S. Cold argues that Hillary intended to abandon the easement because it acquiesced in U.S. Cold's tearing up the tracks and laying asphalt in July 1992. However, Hillary brought this action as soon as it bought the property. Krueger, president of Hillary, testified that he planned to repair the tracks upon parcel C after establishment of the easement through this lawsuit. Thus, we find that Hillary did not intend to abandon the easement. As a result, we conclude that Hillary possesses an implied easement for railway access across the property (parcel B) of U.S. Cold.

### V. CONCLUSION

We determine that Hillary's predecessor in interest possessed an implied easement for railway access across U.S. Cold's property and did not intend to abandon the easement. Thus, we determine that the implied easement existed when the property was transferred to Hillary. We further determine that Hillary did not intend to abandon the easement. As a result, we conclude that Hillary possesses an implied easement for railway access across the property of U.S. Cold. We therefore reverse, and remand for further proceedings.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

WHITE, C.J., and LANPHIER, J., not participating.